## Margaret T. Clarke, Plaintiff in Error, v. Julius S. Taylor, Defendant in Error.

### Gen. No. 20,144.

1. APPEAL AND ERROR, § 578*—*when findings of master are assumed to be correct.* Where no exception is taken to findings of facts, it will be assumed on appeal that the master states them correctly.

2. LIMITATIONS OF ACTIONS, § 117*—*when action on note is barred.* Evidence *held* to show that liability of a defendant on a note and mortgage to his sister, given in settlement of her claims to the estate of their father, was barred by the statute of limitations, it appearing that a payment to the plaintiff by the defendant's son was not the act of such defendant or by his authority.

3. TRUSTS, § 43*—*when resulting trust arises.* Where a brother gave his sister a note and mortgage in settlement of her claims

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

to the estate of their father, and such mortgage was not recorded or paid, and the defendant subsequently sold the property covered by the mortgage, but not until after the mortgage had ceased to be enforceable, no trust arise as to the money received by him in favor of the sister.

4. Trusts, § 66*—*when constructive trust arises.* Evidence *held* insufficient to show that a settlement entered into by a brother and sister, whereby the former gave a note and mortgage to the sister for her share in their father's estate, was so affected with fraud that a constructive or resulting trust arose in favor of the sister, although the valuations placed on the property were unfair to the sister.

5. Trusts, § 238*—*when action to enforce trust is not barred by lapse of time.* Where a brother gave a sister a note and mortgage for her share in their father's estate, and also for a sum entrusted to such father, and in an action for an accounting it appeared that the note as such was unenforceable against the defense of limitations, the evidence did not show intelligent knowledge or assent by the sister to the destruction of the constructive trust raised by the assumption of possession of the money by the son and heir of the original trustee, and such trust fund was not converted into an ordinary debt, wherefore the defense of limitations was not available as to the money loaned.

Error to the Superior Court of Cook county; the Hon. Clinton F. Irwin, Judge, presiding. Heard in this court at the March term, 1914. Reversed and remanded with directions. Opinion filed December 21, 1914. Rehearing denied January 4, 1915.

Edgar L. Masters, for plaintiff in error.

Louis Lagger, for defendant in error; William T. Payne, of counsel.

Mr. Presiding Justice Brown delivered the opinion of the court.

This writ of error is sued out to reverse a decree of the Superior Court of Cook county, dismissing for want of equity a bill brought by the complainant, Margaret Taylor Clarke, against Julius S. Taylor, her brother, for an accounting and to enforce the execution of an alleged trust.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Assuming on all disputed points but one, to be here-after discussed, the correctness of the defendant's ver-sion of the occurrences and transactions resulting in the litigation herein involved, those occurrences and transactions, as shown by the pleadings and evidence, were:

When the father of the complainant and defendant, one Julius Taylor of Kankakee, died in 1891 he left only these two children his heirs. The complainant was a widow. Her husband had died a little more than two years before. He left a life insurance policy of $5,000, on which his widow, the complainant, received $4,800. Her father, Julius Taylor, learning that she was about to lend this money on mortgage of real es-tate in Chicago, suggested that she "let him have it," leaving with her no note or contract specifying time, terms or conditions of payment or interest, except that he said he would "give her the same interest that she would get there." Some piece of paper, which the father said pertained to complainant's sister-in-law's land, but which complainant never read, was handed by the father to his daughter and immediately returned by her to him, she had "so much confidence" she says. The father paid no interest nor returned any part of the principal, but, as the defendant says, in the orig-inal sworn answer filed by him in this cause, "there was still at his father's death in his hands  *  *  * the sum of $4,800." This declaration the defendant repeated in the same language in an amended answer filed six months later and shortly before he gave a de-position in this cause.

The father left of personal estate, however, only $430, which was not enough to pay funeral expenses and doctor's bills and "debts that he had around town." He did, however, leave a house and lots ad-joining in Kankakee and a farm of three hundred and twenty acres.

In default of a will which was supposed to exist, but which could not be found, the brother and his widowed

sister undertook to settle affairs between them without the interference of the Probate Court. It is evident from the character of her testimony and by her course of proceeding that the complainant was unversed in business. Whether or not her brother, the defendant, was so versed, does not appear, otherwise than that he had been a traveling salesman and also in business for himself in Indiana. This was the settlement he made with his widowed sister: He took the farm at an agreed valuation of $16,000, and gave his sister the Kankakee house and lots at an agreed valuation of $6,000. Quitclaim deeds were exchanged to vest these titles. As at these valuations, each would have been entitled to $11,000 worth of property, the defendant admitted himself as owing $5,000 "owelty" to the complainant. At the same time, if the $4,800 was in his father's hands, he must have taken possession of that. He did not, however, turn it over to his sister, to whom it belonged. He says, in his deposition: "I assumed that $4,800." He gave her a note for $9,800 to represent the $5,000 and the $4,800. It ran thus:

"Kankakee, Ills., May 11th, 1891.

On or before five years after date I promise to pay to the order of Margaret T. Clarke $9800 Nine Thousand Eight Hundred Dollars with interest at the rate of six (6) per cent. per annum. Value received. Interest payable semi-annually.

JULIUS S. TAYLOR."

To secure this note of $9,800 the defendant gave his sister a mortgage on one-half the farm, that is, on one hundred and sixty acres. The valuation on which the settlement was made, assuming an equal or average value per acre of the farm, would have made this quarter section worth $8,000—not a very satisfactory security for $9,800.

The deed to the house and lots in Kankakee running to Margaret T. Clarke was recorded in Kankakee county on May 11, 1891.

On Mrs. Clarke's examination before the master in this cause, the deed was shown her by counsel and she was asked:

"Q.  Is this the deed to the town house in Kankakee that you got?  A.  Yes, sir.  That is the only deed I ever had.

Q.  And you recorded that?  A.  Yes, sir."

Mr. Hunter, the lawyer who was called in and drew these papers—note, quitclaim deeds and mortgage—testified that they were all executed at the same time at the Taylor house in Kankakee and that he does not remember taking possession of any of them to carry to record or otherwise afterwards.  As the quitclaim deeds are dated May 9th, and the one to Margaret Clarke (which alone appears in the transcript, although both were introduced in evidence) was acknowledged before Hunter on May 9, 1891, while the note and mortgage are dated May 11, 1891, and the latter acknowledged on that date before Mr. Hunter, it would appear that Mr. Hunter was mistaken in his testimony.  He was asked if he did not remember that Julius S. Taylor, the defendant, handed him the two quitclaim deeds and that he took them back to the recorder's office, which was next to his own in the court house, and had them recorded, and replied that he did not so recollect, but that he would not say that was not the fact.  The significance of this testimony about recording lies in the fact that while both quitclaim deeds were recorded—the recorder's certificates showing that they were recorded at practically the same time—the mortgage was never recorded; and for this neglect the complainant has suffered.  The defendant's counsel strenuously insists on the "laches" of the complainant, who must have known, he says, of the necessity of recording the mortgage because she recorded the quitclaim deed.

It does not appear in the evidence, but it is stated in the sworn bill of the complainant; and seems to be

assumed as true, that the complainant sold the house and lots in Kankakee years afterwards for $4,000. She alleges she used her best efforts to obtain a better price. The defendant had better success. He is careful to say in his answers and in his testimony that he did not advise his sister about recording her mortgage. We must assume, in the lack of evidence to the contrary, that he neither advised her to record nor to abstain from recording the mortgage. His testimony, however, that he does not know what Mrs. Clarke did with her mortgage cannot be considered as meaning that he did not know that she had left it unrecorded. A man does not "traffic," as he admits in his sworn answer he did, in land encumbered for more than it is worth at his own valuation, without knowing that the prior encumbrance is not in the way of his negotiations. He had not forgotten his sister's mortgage nor was he ignorant of its existence when, because of its absence from the record, he was enabled, as the master finds, to sell to "a bona fide purchaser" "the whole of said lands, including the land on which the complainant held her unrecorded mortgage for $26,860."

Counsel for defendant deprecates any complaint being made of the "trafficking" admitted by the defendant. He says:

"There is no merit in such complaint, because if there was no fiduciary or trust relation created in or by the settlement in question, the parties must be held to have dealt at arms length. In such event each of the parties had the undoubted right to subsequently deal in the title of their own respective holdings. No authority has been or can be cited that a person giving a mortgage is estopped from further encumbering his land, or from selling the same. Neither does the law require the mortgagor to see to the recording of the mortgage he gives."

If this is to be understood as meaning that because the law gives to an innocent subsequent purchaser or encumbrancer, ignorant of a prior mortgage, a priority

of right over such mortgage, the mortgagor is not guilty of fraud towards the prior mortgagee when, in effect, he deliberately steals his or her security,—we must dissent. It is a penal offense to deal in that way with personal property mortgaged. We see no greater crime morally in that than the defendant in this case committed towards his sister.

The findings of the master in relation to payment on the note of $9,800 which the defendant had given to the complainant, and the dealings of the defendant with the land which he had mortgaged to her to secure it, are these, when chronologically arranged:

November 11, 1891, he paid the complainant $319.

July 6, 1894, he placed a mortgage on the whole three hundred and twenty acres (including the one hundred and sixty on which the complainant held a mortgage), the amount not stated. October 20, 1894, this mortgage was released.

February 4, 1895, he paid his sister $50 more; November 4, 1895, another $50.

August 19, 1897, he placed a mortgage on one hundred and sixty acres of his land (which one hundred and sixty acres is not mentioned), which mortgage was not released until March 5, 1906.

Meanwhile, in June, 1898, and November, 1898, he made his last payments to his sister—$25 on the first date and $50 on the second.

September 10, 1902, he placed a mortgage on the whole three hundred and twenty acres for $14,000, which on October 14, 1907, was released. But on October 5, 1907, he mortgaged "one-half of said lands for the sum of $7,000 and afterwards, on November 12, 1910, he and his wife made an absolute conveyance of the whole of said lands, including the land on which the complainant held her unrecorded mortgage, to a bona fide purchaser for the consideration of $26,860, and since the making of said last mentioned convey-

ance said Julius S. Taylor has had no right, title or
interest in said lands.''

As no exception has been taken to the findings of the
facts and the dates of these specified mortgages and
conveyance, we assume the master states them cor-
rectly, although we are somewhat at a loss on inspect-
ing the record to see how the master ascertained pre-
cisely the date and extent of the final conveyance. With
what we conceive may be a somewhat characteristic
wavering of statement, the defendant has given sev-
eral dates for it. In his deposition he says nothing
about it, but in his sworn answer filed October 13, 1911,
he says that:

"On October 5, 1907, he mortgaged *one-half* of the
said Three Hundred and Twenty acres for the sum of
$7,000 and afterwards, on November 12, 1910, together
with his said wife, duly conveyed *the same* for a con-
sideration of $26,860.''

This would apparently mean that he had sold only
one-half his land on November 12, 1910. In his
amended answer filed May 1, 1912, he makes the same
statement in the same words, but immediately follows
it with this allegation:

"And that *since* the said eleventh day of May, A.
D. 1891, (the date of the mortgage to his sister) and
the *commencement of this suit* he has sold and con-
veyed to other persons the whole of said Three Hun-
dred and Twenty acres and is not now the owner or
possessor of any part thereof.''

This may be a clerical error, and insertion of the
word "before" may have been meant between "and"
and "the commencement," but we are puzzled to ac-
count for the assertion further on in the amended an-
swer, "that from the said ninth day of May, A. D. 1891,
*until the month of December, A. D. 1906,* this defend-
ant continuously resided upon and wholly occupied
and held the sole possesion of the whole of the farm
lands  *  *  *  and that the said grantees of this de-

fendant to whom he conveyed the whole of said farm lands as aforesaid had a like adverse possession and a like actual residence upon the whole of said farm lands *from and including the said month of December, A. D. 1906;* that when this defendant surrendered the possession of the said farm lands to his said grantees *because of his said conveyance to them in the said amount last above mentioned,* the said grantees of this defendant took immediate possession and forthwith took up their residence upon said farm lands and held the same as aforesaid.''

However this may be, there is no doubt the land is no longer in the defendant's hands or available for the complainant's security. But this is not all of her misfortune. The defendant insists and the master and court below have found that all personal liability of the defendant to her has also vanished.

The last payments of either principal or interest, as above stated, were made in 1898, and left due, if all the payments were applied on the principal and no account taken of interest, over $9,300. In December, 1910, the complainant asked for money from the defendant, but the defendant's son opened the letter and without consulting his father or obtaining authority from him furnished his aunt from his own funds with $50, which the complainant accepted as a loan, the master finds; and when a further demand by the complainant was made on the defendant he invoked the protection of the (to him) beneficent statute of limitations, which he sets up and insists on in his answer in this case.

This statement of the case, as we said in the beginning, assumes the accuracy of defendant's version of these matters, except as to the relation between the complainant and her father in the first instance, and between the complainant and the defendant afterwards, as to the $4,800.

The defendant maintains that his father borrowed the $4,800 from Mrs. Clarke and that he, the defend-

ant, merely assumed the debt, and evidenced it, as his father had not, by a promissory note, and that no trust relation existed between any of the parties as to this money. It is maintained for him by counsel that when the father died this $4,800 was not in his hands, but had been spent or paid out, and that the defendant in his testimony means, when he says that his father left only $430 of personal estate, that no such sum of $4,800 was found. We think he has estopped himself by his answer, which we have quoted, from putting such a construction on his meager testimony in this regard. And there are other considerations which are of force in this matter. If the $4,800 was a simple loan to the father, why was no note given? Why was no interest paid? Why was no time set for its repayment? It seems to us more reasonable to suppose that the father—an old resident of Kankakee and a prominent member of the Presbyterian Church there —thought that he could take better care for his daughter of her "widow's mite" than she herself, unversed in business and the methods of mortgage brokers, would be likely to do.

As to the money being on hand when the father died and its having been taken possession of by defendant, there are also, to our minds, objections to the theory to the contrary advanced in behalf of the defendant. If the $4,800 was not on hand, it was, whether trust funds or not, a claim against the estate. The defendant was under no obligation, if he did not find the money and did not take possession of it, to make himself personally responsible for it to his sister. His subsequent conduct does not strongly tend to establish any presumption that he would go beyond his legal obligations to help "a widow in her affliction" even when that widow was his sister. The valuation he put on the farm was $16,000 and on the house $6,000. It is the theory of the defense that they were reasonable valuations at the time. Then the value of the estate

was $22,000 less $4,800, which should have been paid from it to Mrs. Clarke at the earliest possible moment. The residue would have been of the value of $17,200. One-half of it, or $8,600, would have been Mrs. Clarke's and one-half, or $8,600, the defendant's. If she took the Kankakee house at $6,000 she would have been entitled to only $2,600 more from her brother had he taken what remained of the estate. If, then, he had come to an agreement with his sister by which he was to substitute himself for the estate as the debtor, and to retain the farm intact instead of having it sold to pay the claim of $4,800 against the estate, he would have been indebted to her only in the sum of $4,800 plus $2,600, or $7,400, instead of in the sum of $9,800. The settlement that he actually made, assuming that he intended to carry it out without fraud, would, in that case, as the counsel for complainant points out, mean that he gave his sister values of $15,800 and took values of $6,200—when the payment of her just dues and an equal division of the residue would result in her obtaining the value of $13,400 and he the value of $8,600. We find it difficult in the light of his subsequent conduct to believe that he thus treated his own interests.

In this litigation the complainant, as we understand, has maintained that the defendant should account to the complainant: *First,* for the $4,800 which she asserts was entrusted to her father and at his death taken possession of by the defendant, who thereby became a trustee for her in regard to it; *second,* up to the amount of the remainder of the $9,800 note for the proceeds of the farm so far as those proceeds were moneys obtained by the defendant for land which he had mortgaged to her to secure owelty, and then sold regardless of the mortgage; *third,* in addition to this, for half the proceeds of the farm in so far as those proceeds exceeded the value of the house and lots and the owelty which he allowed her in computing the amount of the note he gave her in 1891,—this last

demand being predicated on the allegation either that no final valuation was agreed on, or that it was agreed that anything obtained by the defendant on a sale of the farm over and above the valuation placed on it by him in the adjustment should accrue to the benefit of the complainant equally with the defendant; *fourth,* for interest upon these amounts to the present time.

In the alternative the complainant says that if the settlement in 1891 between the complainant and defendant is to be considered as one which negatives or excludes the theory of a trust, the note of $9,800 is still enforceable, the last payment having been made thereon, as she alleged, in December, 1910, and not earlier, and the running of the statute of limitations having been thereby tolled. The master found against all these contentions and the chancellor confirmed the report, overruled all the objections and dismissed the bill.

With some of the findings of the master and with the chancellor's disposition of some of the exceptions to his report, we are compelled to agree. There seems no doubt from the evidence that the delivery of $50 to the complainant in December, 1910, was not the act of the defendant or by his authority. He has not manifested at any time since the period of limitation expired a disposition to do anything which should recognize either a legal or moral right in his widowed sister to the amount of the note he gave her, partly for her husband's life policy and partly for her share in her father's farm. He was under no obligation even to plead the statute in this litigation, but he has done so and we must hold that the liability of the defendant on the note of $9,800 itself, as a note, disjoined from any question of a trust in its consideration, is unenforceable, and would have been so unenforceable in the face of the defendant's choice to plead the statute to it, at all times since November, 1908; and also, that since that date no foreclosure could have been made of the mortgage securing the note.

Therefore, although there is at least plausible ground for arguing, as the complainant does, that money received by a mortgagor for land, which he knows to be subject to his unpaid, unrecorded and enforceable mortgage, can be considered as received by him with a resulting trust in favor of the mortgagee attaching thereto, we cannot hold, in face of the finding that the defendant did not sell his land and receive the consideration for it until after the mortgage had ceased to be enforceable, that any trust was fastened upon the money so received by him.

Again, whatever reasons for suspicion may be found in the evidence that the valuations of $16,000 and $6,000, placed on the farm and house and lots respectively in 1891 by the brother and sister, were unfair to the complainant, the evidence as a whole falls short of proving that which would be necessary to so infect the arrangement with fraud that a constructive or resulting trust would be raised.

We are accordingly in agreement with the master and with the court below as to all but the $4,800 which the complainant derived from her husband's life insurance policy, entrusted, as we think, for safe-keeping and care to one who stood in a position naturally inviting her trust and confidence, and after his death, as we also think, taken possession of by her remaining nearest relative and natural protector.

As to this $4,800, the only question after these conclusions remaining for us to decide is, whether its inclusion on the note of $9,800 secured by a mortgage which is now, as well as the note, treated by the defendant as though it were never in existence, destroyed the trust character of the funds thus acquired by him, so that, because the note as such is unenforceable as a note against the defense of limitation, the complainant has lost all remedy in relation to them.

Mature consideration has convinced us that it has not. Each case of apparent or alleged conversion of a trust fund into an ordinary debt must be considered with regard to its own surrounding circumstances. In this case the relations and situation of all the parties involved and the precedent, contemporaneous and subsequent actions of them all, make us believe that there was no intelligent knowledge or assent by the complainant to the destruction of the constructive trust, which the assumption of possession of the money by a son and heir of the original trustee, raised. To quote from a distinguished text writer (Perry on Trusts, 6th Ed., vol. 1, sec. 245):

"During the possession and management by such constructive trustees they are subject to the same rules and remedies as other trustees, and they cannot avoid their liability by showing that they were not in fact trustees, nor can they set up the Statute of Limitations."

We think the court below erred in not sustaining the first, second, third and sixth exceptions to the master's report, and in confirming and approving the master's report in all respects and overruling all the complainant's exceptions thereto and dismissing the complainant's bill for want of equity, and the decree is therefore reversed and the cause remanded to the Superior Court with directions to sustain the exceptions to the master's report above indicated, and to enter a decree requiring the defendant, as trustee, to account to the complainant for $4,800 with interest at five per cent. from May 11, 1891, which is found by us to be a date subsequent to his taking possession of the same, taking credit, however, for the payments proven to have been made and proper interest allowance thereon, and to pay over the sum and interest thus found remaining due to her.

*Reversed and remanded with directions.*